# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALFORNIA

**DANIEL JOSEPH NOBLE,**

Defendant,

v.

**UNITED STATES OF AMERICA,**

Plaintiff.

CASE NO. 2:22-CR-00123-DJC

## SENTENCING MEMORANDUM

**ERIN J. RADEKIN**
2012 H Street, Suite 202B
Sacramento, CA 95811
Telephone:  (916) 504-3931
Facsimile:   (916) 447-2988
Email: erinjradekin@gmail.com

Attorney for Defendant
**DANIEL JOSEPH NOBLE**

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................................. ii

**TABLE OF AUTHORITIES** ........................................................................................ iii

I.     **INTRODUCTION** ................................................................................. 1

II.     **THIS COURT SHOULD VARY DOWNWARD BECAUSE THE U.S.S.G. §
2G2.2 GUIDELINES HAVE BEEN CRITICIZED BY THE UNITED STATES
SENTENCING COMMISSION AND ARE UNWORTHY OF JUDICIAL
DEFERENCE** ..................................................................................... 4

III.     **THE COURT SHOULD VARY DOWNWARD TO AVOID
UNWARRANTED DISPARITY** ...................................................... 12

    A.     **Unwarranted Dispaarity Created by Coruts Varying Below the
Guiedelines for Non-Production Child Pornography Offenders
Generally** ....................................................................................... 12

    B.     **Unwarranted Disparity Created by Sentences Received by Other
Defendants Who Participated in the Same Kik Chatroom, Engaged in
Substantially Identical Conduct, and Were Arrested as a Result of the
Same Undercover Operation** ......................................................... 13

        1.   *Brian La Plante, Southern District of Florida case Number
1:22-CR-20184* ......................................................................... 14

        2.   *Benjamin Pitsch, Western Division of Louisiana Case Number
2:22-CR000191* ......................................................................... 14

        3.   *Drew Linn Jennings, Middle District of Pennsylvania Case
Number 3:22-CR-00204* ........................................................... 15

    C.     **Unwarranted Dsiparity Created by Mr. Noble's Inelligibility for
Status as a "Zero-Point" Offender under U.S.S.G. § 4C1.1** ....... 15

    D.     **Unwarranted Disparity Created by Me. Noble's Inelligibility for
Earned Time Credits under the First Step Act** ............................ 16

**IV.    THIS COURT SHOULD VARY DOWNWARD BECAUSE THE CALCULATION OF THE NUMBER OF IMAGES PURSUANT TO U.S.S.G. § 2G2.2(b)(7)(D) HAS NO RATIONAL CONNECTION TO INCREASED CULPABILITY** ................................................................ 16

**V.     THE COURT SHOULD VARY DOWNWARD BECAUSE OF MR. NOBLE'S EFFECTIVE USE OF COUNSELING WHILE UNDER SUPERVISION DEMONSTRATING IMPRISONMENT IS NOT NEEDED TO PROMOTE RESPECT FOR THE LAW, TO AFFORD ADEQUATE DETTERENCE, OR TO PROTECT THE PUBLIC FROM FURTHER CRIMES** ................................................................ 18

**VI.    THE COURT SHOULD VARY DOWNWARD BECAUSE OF MR. NOBLE'S YOUTH AT THE TIME OF THE OFFENSE** ...................... 19

**VII.   "THE NATURE AND CIRCUMSTANCES OF THE OFFENSE" AND THE "HISTORY AND CHARACTERISTICS OF THE DEFENDANT" AS WELL AS THE OTHER § 3553(a) FACTORS DISCUSSED ABOVE SUPPORT A SENTENCE OF FIVE YEARS** .................................... 21

**VIII.  CONCLUSION** ................................................................................ 23

**PROOF OF SERVICE** ................................................................................ 24

iii

1
2

# TABLE OF AUTHORITIES

## Cases

*Kimbrough v. United States*, 552 U.S. 85 (2007) ............................................................. 5

*Pepper v. United States*, 562 U.S. 476 (2011) .............................................................. 19

*United States v. Chavarria*, 377 F.3d 475 (5th Cir. 2004) ........................................... 11

*United States v. Corbitt*, 879 F.2d 224 (7th Cir. 1989I ................................................. 13

*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) ........................................... 4-5, 11

*United States v. Green*, 152 F.3d 1202 (9th Cir. 1998) ............................................... 19

*United States v. Grober*, 624 F.3d 592 (3rd Cir. 2010) ................................................ 5

*United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011) ...................................... 4, 11

*United States v. Pena*, 930 F.2d 1486 (10th Cir. 1991) ............................................. 23

*United States v. Stone*, 575 F.3d 83 (1st Cir. 2009) .................................................... 5

## Statutes

18 U.S.C. § 2256(5) .................................................................................................... 17

18 U.S.C. § 2256(8) .................................................................................................... 17

18 U.S.C. § 3553(a) ................................................................................................ *passim*

18 U.S.C. § 3553(a)(4) ................................................................................................ 11

18 U.S.C. § 3553(a)(6) ................................................................................................ 12

18 U.S.C. § 3632 ........................................................................................................ 16

18 U.S.C. § 3632(d)(4)(D) .......................................................................................... 16

iv

18 U.S.C. § 3632(d)(4)(D)(xlii) ................................................................. 16

U.S.S.G. § 2G2.2 ............................................................................... *passim*

U.S.S.G. § 2G2.2(b) ........................................................................... *passim*

U.S.S.G. § 2G2.2(b)(2) ....................................................................... *passim*

U.S.S.G. § 2G2.2(b)(4) ................................................................. 6, 9, 14

U.S.S.G. § 2G2.2(b)(6) ............................................................. 6, 9, 14, 15

U.S.S.G. § 2G2.2(b)(7) ............................................................. 6, 9, 10, 17

U.S.S.G. § 2G2.2(b)(7)(A) ................................................................. 18

U.S.S.G. § 2G2.2(b)(7)(D) ........................................................... 16, 17

U.S.S.G. § 2G2.2(b)(3)(F) ...................................................... 7, 9, 14, 15

U.S.S.G. § 4C1.1 ........................................................................... 16

U.S.S.G. § 4C1.1(a)(1) ................................................................... 16

U.S.S.G. § 4C1.1(a)(2)-(a)(10) ......................................................... 16

U.S.S.G. § 5H1.1 ....................................................................... 19, 20

**Other**

Application Note 1 to U.S.S.G. § 2G2.2 ................................................ 8

Application Note 6 to U.S.S.G. § 2G2.2 ............................................ 16, 17

**ERIN J. RADEKIN**
**Attorney at Law – SBN 214964**
2012 H Street, Suite 202B
Sacramento, CA 95811
Telephone:  (916) 504-3931
Facsimile:  (916) 447-2988
Email: erinjradekin@gmail.com

Attorney for Defendant
DANIEL JOSEPH NOBLE

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| **THE UNITED STATES OF AMERICA**, | CASE NO. 2:22-CR-00123-DJC |
| Plaintiff, |  |
| v. | **SENTENCING MEMORANDUM** |
| **DANIEL JOSEPH NOBLE,** | Date: September 12, 2024 |
| Defendant. | Time: 9:00 a.m. |
|  | Court: Hon. Daniel J. Calabretta |

## I.    INTRODUCTION

Mr. Noble is 28 years old and has no criminal history.  Presentence Report ("PSR") at p. 2, ¶¶ 51-59.  He is loved by his family, who has remained supportive even after learning of the charges and the facts supporting the charges in this case.  Friends, family, coworkers and others who know him well attest to his good character and reputation, even after learning he uploaded videos containing child pornography.  PSR at ¶ 33; ECF No. 73-7.  When first contacted by law enforcement, Mr. Noble admitted that he had been a member of the Kik group yungvidschilddd, admitted that he uploaded videos containing CSAM to that group that he had obtained from other Kik users, and was in all respects fully cooperative.  PSR at ¶ 18.  He denied that he created the videos, denied ever committing an assault against a child, and said he would be

1

willing to take a polygraph examination.  ECF No. 1 at p. 7.  There is not a scintilla of evidence, even after an investigation into Mr. Noble's conduct while working as a coach, that he has ever committed an offense against a child.

At the time of his arrest Mr. Noble was working as a water polo coach at U.C. Davis and Davis Water Polo Club.  PSR at ¶¶ 80-81.  After his arrest, U.C. Davis launched an extensive investigation that found no evidence that Mr. Noble had ever engaged in an offense against a minor or inappropriate conduct while working as a coach.  PSR at ¶ 20; and *see* Exhibit C.[1]  The investigators found that Mr. Noble was generally well-respected and well-liked.  It was noted, "Indeed, the friends of Noble who we interviewed described him as well-liked and fulfilled by his role as a coach, and none of them identified any behavior by Noble that struck them as troubling."  Exhibit C at p. 6.  The investigators concluded that "Noble kept any alleged activity involving [Child Sexual Abuse Material (CSAM)] separate from his professional life" as a water polo coach.[2]  *Id*. at p. 7.

While on pretrial release from May 20, 2022, through June 13, 2024, Mr. Noble suffered no violations and participated in mandated sex offender treatment.  His treatment provider, Jessica Belfy, Ph.D., opines that Mr. Noble "demonstrates emotional sensitivity to the plight of child sexual abuse victims and has made significant progress in addressing the factors that

---

[1] Exhibit C is Phase I Investigation Report to U.C. Davis regarding Daniel Noble (June 2022), the results of the investigation.

[2] The government and victims have repeatedly noted that Mr. Noble worked as a water polo coach in the context of condemning his conduct, suggesting this is an aggravating factor. The Court should not view the fact that Mr. Noble worked as a water polo coach as an aggravating factor in the absence of any evidence that Mr. Noble engaged in a sexual assault or inappropriate behavior while working as a coach.  Indeed, the weight of opinion of his evaluators, his friends, past coworkers (including past water polo coaches he worked with), and family, supports the conclusion that Mr. Noble did in fact keep his CSAM activity entirely separate from the rest of his life.

contributed to his offending." Exhibit A (under seal).[3]  She noted the absence of psychopathy or criminal orientation in Mr. Noble also support her opinion that he poses a "below average" risk of reoffending.  PSR at ¶ 66; Exhibit A.

Mr. Noble was also evaluated by forensic and clinical psychologist, Veronica Thomas, Ph.D., who, like Dr. Belfy, opines that he "is not psychopathic, psychotic or unable to understand and appreciate the magnitude of his charged conduct[,]" that his "remorse is genuine and he understands the risks to the community of the charged conduct[,]" and he "is amenable to community based treatment and represents a low risk of molesting a child".  Exhibit B (under seal) at pp. 18-19.[4]

Mr. Noble also engaged in his own efforts at rehabilitation that were not court-ordered, including participating in telephonic counseling sessions with Dr. Thomas.  ECF No. 73-7 at p. 20.  She reported that his "community behavior following our formal evaluation is … consistent with [the findings of her evaluation]."  She added,

> I have specific professional training and experience in the critical analysis and evaluation of sexual deviance, including multiple paraphilias and personality disorders for 40 years. There is no indication from Mr. Noble's assessment or professional interactions that he represents a risk of harm to any persons in the community should he remain out of custody. … His ability to know deeply the motivations for his behaviors is established and good.

*Id.*

In addition, Mr. Noble participated in 35 hours of counseling with pastor/teacher Michael Bradley of Rainbow Community Church in Fallbrook, California.  ECF No. 73-7 at p. 23.

---

[3] Exhibit A is the letter from Jessica Belfy, Ph.D., Mr. Noble's treatment provider in his court-ordered sex offender treatment program, and her curriculum vitae.  The letter was previously ordered sealed by the court.

[4] Exhibit B is the evaluation of Dr. Thomas and her curriculum vitae.  This evaluation was previously ordered sealed by the court.

Based on Mr. Bradley's experience as a jail chaplain for about 12 years and as a Christian counselor, Mr. Bradley opined that Mr. Noble is "in the small percentage of people who can take ownership of their wrong doings while at the same time exhibiting tremendous strength in taking the steps necessary to change his thinking and behavior to prevent this from ever happening again." *Id.*

Given Mr. Noble's character, the factors discussed by his evaluators, and the factors under 18 U.S.C. § 3553(a) discussed below, five years in prison is "sufficient, but not greater than necessary" to satisfy legitimate sentencing objectives. The mandatory minimum sentence prescribed by Congress for "distributing" child pornography is more than sufficient punishment and deterrence for this young man who poses no danger to the community. A sentence longer than five years would be excessive and unjust. He therefore asks the Court to sentence him to the minimum term of five years imprisonment for each of the reasons discussed below. Such sentence is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing Congress has prescribed at § 3553(a).

## II. THIS COURT SHOULD VARY DOWNWARD BECAUSE THE U.S.S.G. § 2G2.2 GUIDELINES HAVE BEEN CRITICIZED BY THE UNITED STATES SENTENCING COMMISSION AND ARE UNWORTHY OF JUDICIAL DEFERENCE.

Judges throughout the United States have found § 2G2.2 to be artificially inflated, so that they routinely vary below the guideline range to avoid imposing a sentence grounded in panic and politics rather than in the calm rationality of § 3553(a).

In *United States v. Henderson*, 649 F.3d 955, 963 (9th Cir. 2011), the Ninth Circuit held that § 2G2.2 deserves little deference because it is "not the result of the [Sentencing] Commission's 'exercise of its characteristic institutional role,' which requires that it base its determination on 'empirical data and national experience[.]'" In *United States v. Dorvee*, 616

4

F.3d 174, 187 (2d Cir. 2010), the Second Circuit deemed § 2G2.2 "irrational[]" and found it to be "fundamentally incompatible with § 3553(a)" because, by pushing all child pornography offenders towards the maximum term, it "eviscerates the fundamental statutory requirement in § 3553(a) that district courts consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *See also United States v. Grober*, 624 F.3d 592 (3rd Cir. 2010); and *United States v. Stone*, 575 F.3d 83, 97 (1st Cir. 2009) (("[W]e wish to express our view that [§ 2G2.2 is] in our judgment harsher than necessary. . . . [F]irst-offender sentences of this duration are usually reserved for crimes of violence and the like."). These decisions arose after the Supreme Court held in *Kimbrough v. United States*, 552 U.S. 85, 109 (2007), that "[t]he crack cocaine Guidelines," mandated by Congress in the same manner as the § 2G2.2 guidelines, "do not exemplify the Commission's exercise of its characteristic institutional role," did not take account of "empirical data and national experience," and therefore lack persuasive force.

In June 2021, the United States Sentencing Commission issued a report entitled "Federal Sentencing of Child Pornography: Non-Production Offenses," which updated a similar report the Commission published in 2012.[5] In the 2012 Report, the Commission recognized that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outmoded measures

---

[5] These reports will be referenced herein as "2012 Report" and "2021 Report."

"2012 Report" is available at this link:
https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf.

"2021 report" is available at this link:
https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_Non-Production-CP.pdf.

of culpability regarding offenders' collections" and that "[a]s a result, the current sentencing scheme results in overly severe guideline ranges for some offenders." *Id*. at p. 321.  The Commission recommended Congress take steps to remedy problems with the child pornography statutes and guidelines, but Congress has not acted.  Because "Congress has not implemented the Commission's statutory and guideline recommendations," § 2G2.2 "remains largely unchanged, with the guideline enhancements for non-production child pornography offenders at issue in the 2012 [report] still in effect.  As a result, judges have continued to sentence most non-production child pornography offenders below their guideline ranges, most often by imposing variances pursuant to 18 U.S.C. § 3553(a)."  2021 Report at p. 3.

Mr. Noble contends there are grounds to vary downward from the guideline range based upon two factors the Commission recognized in its 2012 and 2021 reports.  First, a downward variance is warranted to ameliorate the punitive effect of the charging decision made by the United States, which artificially increases the guidelines for conduct that, with equal justice, could have been charged as possession.  Mr. Noble pled guilty to distribution of child pornography, a charge that carries a five-year mandatory minimum, rather than possession of child pornography, which carries no mandatory minimum term, even though his conduct consisted of downloading videos and images from a Kik chatroom and then later uploading them to a yungvidschilddd, accessible only by the members of that chatroom.

Second, he contends a downward variance is warranted to ameliorate the effect of guidelines §§ 2G2.2(b)(2), (b)(4), (b)(6), and (b)(7), which do not meaningfully distinguish one non-production defendant from another.  These four enhancements occur in nearly all child pornography cases, where they are deemed to be "specific offense characteristics" that aggravate the base offense level.  They require a *13-level increase* in offense level, increasing the

6

guideline range from 30 to 37 months (representing the base offense level of 22 plus two for knowing distribution under § 2G2.2(b)(3)(F), minus three for accepting responsibility) to 151-188 months – *a five-fold increase*.

The ostensible purpose of "specific offense characteristic" enhancements is to distinguish a particular defendant's crime from the heartland of child pornography cases and to enhance the sentences of the worst offenders.  But the Sentencing Commission concluded that it is not reasonable to enhance the penalty for a crime beyond what is typical for a "specific offense characteristic" that is present in every case, or in most cases.  The 2021 Report states: "The changes in computer and internet technology typically used by non-production child pornography offenders [have] rendered the sentencing scheme insufficient to distinguish between offenders with different degrees of culpability."  *Id.* at p. 1 (footnote omitted).

Regarding these common 13 levels of enhancements, the Commission in 2021 reported:

The 2012 *Child Pornography Report* explained that by fiscal year 2010, four of the six enhancements in §2G2.2(b) – together accounting for 13 offense levels – applied to the typical non-production child pornography offender and thus failed to meaningfully distinguish between more culpable and less culpable offenders.

In fiscal year 2019, these enhancements each continued to apply in the vast majority of non-production child pornography cases.  Notably, over 95 percent of non-production child pornography offenders received enhancements for use of a computer and for the age of the victim (images depicting victims under the age of 12).  The enhancements for images depicting sadistic or masochistic conduct or abuse of an infant or toddler (84.0% of cases) or having 600 or more images (77.2% of cases) were also applied in most cases . . . .

Thus, across all non-production child pornography offense types, §2G2.2 fails to distinguish adequately between more and less severe offenders.

2021 Report at pp. 18-19 (footnotes omitted).

The charge of "distributing" child pornography as that term has been expanded for purposes of the child pornography statutes and guidelines, is not fairly considered significantly

more culpable than possessing or viewing such a file on a computer, yet the latter carries no mandatory minimum sentence.[6] With rare exceptions, it has been the practice of the United States Attorney for the Eastern District of California to charge distribution rather than possession in order to ensure a prison sentence in cases where judges might be inclined to impose probation. Recognizing this unwarranted disparity, the Commission noted in 2012 that Congress "may wish to revise the penalty structure governing distribution offenses to reflect the evolution of technologies used to distribute child pornography and to differentiate between different types of distribution." 2021 Report at p. 2.

Similarly, as to the child pornography guidelines, "the Commission recommended that Congress enact legislation providing the Commission express authority to amend the guideline provisions that were promulgated pursuant to specific congressional directives[,]" 2021 Report at p. 2. But "Congress has not implemented the Commission's statutory or guideline recommendations. Therefore, § 2G2.2 remains largely unchanged, with the guideline enhancements for non-production child pornography offenders at issue in the 2012 *Child Pornography Report* still in effect. As a result, judges have continued to sentence most non-production child pornography offenders below their guideline ranges." *Id.* at p. 3.

Thus, despite the fact that the act of distributing child pornography as Mr. Noble has done here differs little from possessing child pornography on a computer in terms of actual

[6] Application Note 1 to § 2G2.2 defines "distribution" as "any act, including possession with intent to distribute, production, transmission, advertisement, and transportation, related to the transfer of material involving the sexual exploitation of a minor. Accordingly, distribution includes posting material involving the sexual exploitation of a minor on a website for public viewing but does not include the mere solicitation of such material by a defendant." When Mr. Noble stated during his presentence interview that he uploaded videos in order to get more child pornography, this is true; however, he did this so as to not be deleted from the group. There is no evidence the videos he downloaded and later uploaded reflect an intent to procure any particular content.

culpability, Mr. Noble is subject to a five-year mandatory minimum and also an additional enhancement for distribution under § 2G2.2(b)(3)(F).  Had Mr. Noble been permitted to plead to possession, his base offense level under § 2G2.2 would be 18 rather than 22, and his guideline range without the specific offense characteristics under § 2G2.2(b)(2), (b)(4), (b)(6) and (b)(7), would be 24 to 30 months, less than one-sixth of the term identified in the draft presentence report (PSR) (at ¶ 87).  And his sentence would be less than the five-year mandatory term required for a conviction of distribution.  The Commission found that, for 2019, the average sentence for defendants convicted of possession of child pornography who receive the same specific offense characteristics as those recommended for Mr. Noble, was 57 months.  2021 Report at p. 57.  81.7% of those offenders were sentenced below the guideline range.  *Id*.  In the same year, the most common distribution offender faced the same range calculation as the possession offenders except the base offense level started at 22 rather than 18; the resulting guideline range for these distribution offenders was 151 to 188 months.  2021 Report at p. 58. The average sentence for such offender was 100 months, and 85.8% were sentenced below the guideline range.  *Id.*

With respect to the "specific offense characteristics" that drive these sentences skyward, the Commission found that the five characteristics scored here at PSR, ¶¶ 37 through 41 apply in nearly all cases, thus failing to distinguish one non-production child pornography offender from another.  First, in 2019, over half (52%) of all non-production child pornography defendants received the § 2G2.2(b)(2) enhancement for images of toddlers or infants.  2021 Report at p. 4. "In fiscal year 2019, . . . nearly *every offender* (99.4%) had images or videos depicting victims who were prepubescent or under the age of 13.  In other words, less than one percent of non-production offenders had images or videos consisting solely of victims age 13 years or older."

2021 Report at p. 31 (footnote omitted, emphasis added).  This two-level adjustment is recommended at ¶ 37.

Second, also in 2019, 68.3% of all non-production child pornography offenders distributed child pornography.  2021 Report at p. 33.  This two-level adjustment is recommended at ¶ 38.

Third, also in 2019, 84% of all non-production child pornography defendants received the § 2G2.2(b)(4) enhancement for images depicting sadistic or masochistic conduct or other depictions of violence.  2021 Report at p. 4.  This four-level adjustment is recommended here at ¶ 39.

Fourth, the use-of-a-computer adjustment is the norm rather than the exception in these cases.  In 2019, 95% of defendants received this enhancement.  2021 Report at p. 4.  This two-level increase is recommended at ¶ 40.

Fifth, the Commission found that in fiscal year 2019 the maximum five-level enhancement for number-of-images was applied in 77.2% of non-production cases.  The Commission explained,

> Technological changes have increased the volume and accessibility of child pornography.  As a result of such changes, the typical offender's collection in fiscal year 2019 was voluminous and contained a wide variety of graphic sexual images, including images of very young victims.  Most of the possession, receipt, and distribution offenses involved both images and videos. …
>
> [M]ost non-production child pornography offenses in fiscal year 2019 included a quantity of images, videos, or both that qualified for the maximum 5-level enhancement triggered under §2G2.2(b) … .
>
> Most offenders across all three non-production child pornography offense types have well above the 600 images needed to qualify for the maximum 5-level enhancement under §2G2.2(b)(7). The maximum number of images for possession and distribution offenders numbered in the millions, exemplifying how technology has facilitated the ability to acquire and send enormous quantities of child pornography.

10

2021 Report at p. 30.  This five-level increase is recommended at ¶ 41.

The purpose of guideline enhancements is to assure longer prison terms for those who are more culpable and who engage in more aggravated conduct.  "[T]he very purpose of such adjustments is to take into account culpable conduct outside the norm."  *United States v. Chavarria*, 377 F.3d 475, 480 (5th Cir. 2004).  The guidelines were designed to assure that sentencing practices reflect the information-gathering and the collective wisdom of the Sentencing Commission.  *But the Commission has recommended that Congress amend statutory and guideline provisions to eliminate the anomalies noted above*.  Thus, in recommending a reasonable and just sentence for Mr. Noble, while the Court must "consider . . . the sentencing range established for . . . the applicable category of offense," § 3553(a)(4), the Commission here has deemed that range to be excessive and irrational.  Accordingly, as the Ninth Circuit held in *Henderson*, the Court, in sentencing Mr. Noble, should view § 2G2.2 with skepticism and should consider all the § 3553(a) factors in order to rationally distinguish between offenders.  649 F.3d at p. 964.  In *Dorvee*, the Second Circuit asserted, "District judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under § 2G2.2 [while] bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results."  6161 F.3d at p. 188.

Without these "characteristics" that are common to nearly all non-production cases, Mr. Noble would face a guideline range below the five-year mandatory term.  As argued below, multiple factors under § 3553(a) distinguish Mr. Noble from other child pornography offenders and support a variance below the irrational and excessive guideline range Probation and the government recommend the Court apply to Mr. Noble.

### III. THE COURT SHOULD VARY DOWNWARD TO AVOID UNWARRANTED DISPARITY

#### A. Unwarranted Disparity Created by Courts Varying Below the Guidelines for Non-Production Child Pornography Offenders Generally.

The federal sentencing statute directs the Court "to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6). The district courts of the United States sentence most persons convicted of crimes relating to CSAM to sentences below the applicable guideline range. In 2019 fewer than 30% of persons sentenced under § 2G2.2 were sentenced within the guideline range, with 59% receiving a variance below the guideline range. 2021 Report at p. 5. The Commission observed, "As courts and the government contend with the outdated statutory and guideline structure, sentencing disparities among similarly situated non-production child pornography offenders have become increasingly pervasive. Charging practices, the resulting guideline ranges, and the sentencing practices of judges have all contributed to some degree to these disparities." *Id.*at p. 7. Among the individual offense types, receipt offenders were sentenced within the guideline range at the highest rate (41.8%), followed by possession (32.2%) and distribution (25.3%) offenders." *Id.* at p. 23.

To alleviate these disparities, "Courts increasingly apply downward variances in response to the high guideline ranges that now apply to the typical non-production child pornography offender." *Id.* at p. 23. § 2G2.2, "subject to longstanding criticism from stakeholders," thus has "one of the lowest rates of within guideline range sentences each year." *Id.* At the same time, persons sentenced in non-production child pornography cases continue to be among those least likely to reoffend. The Commission reported a three-year post-release rearrest rate of 27.6%, most of which was for "an administration of justice offense," such as technical violations of

supervised release, with some persons "rearrested more than once." 2021 Report at p. 65. Only

4.3% of such offenders were rearrested for a "sex offense" and only 1.3% (14 of 1,093) were

arrested for "a contact sex offense." *Id.* at p. 65. These statistics apply only to persons who are

closely supervised by federal probation officers and therefore subject to exceptional scrutiny.

And, of course, most of those who are rearrested lack two characteristics present in Mr. Noble's

case that make his chance of reoffending almost nil: (1) an over two-year violation-free period

of community supervision (PSR at ¶¶ 3-6); and the opinions of two expert evaluators that he

poses a low risk of reoffending (Exhibit A (under seal); Exhibit B (under seal) at p. 19).

The disparity between the applicable guideline range and the below-guidelines sentences

typically imposed in these cases supports a substantial variance from the guideline range in this

case.

> **B.      Unwarranted Disparity Created by Sentences Received by Other
> Defendants Who Participated in the Same Kik Chatroom, Engaged in
> Substantially Identical Conduct, and Were Arrested as a Result
> of the Same Undercover Operation.[7]**

Further, to date, three defendants who were participants in the same Kik group and

arrested based on the same undercover operation have been sentenced. As detailed below, the

defendants in these three cases are similarly situated to Mr. Noble in many respects. These three

defendants received sentences between 80 and 87 months. Sentencing Mr. Noble outside of this

range would result in an unjustified disparity.

---

[7] The facts pertaining to these individual defendants were gathered by the undersigned
from documents publicly available on PACER and discussions with these defendant's defense
attorneys. Because presentence reports are confidential and their dissemination restricted, the
undersigned could not get all facts from the documents available on PACER. *See United States
v. Corbitt*, 879 F.2d 224, 239 (7th Cir. 1989) (holding presentence reports cannot be disclosed
absent a court order based on a finding of a "compelling, particularized need"). Thus, facts not
set forth in the attached PACER documents were obtained from these defendants' counsel.

### 1.    Brian La Plante, Southern District of Florida Case Number 1:22-CR-20184

Like Mr. Noble, Brian La Plante participated in the Kik chat group yungvidschilddd. Exhibit D.[8]  He was arrested and ultimately charged with three counts of distribution of pornography and one count of possession of child pornography.  Exhibit E.[9]  According to his attorney, he was 35 years old and had no criminal history.  He was granted pretrial release and incurred no violations.  The offense involved 98 images and 94 videos, so he was held accountable for 7,148 images.  As in Mr. Noble's case, the probation officer recommended adjustments under § 2G2.2(b)(2) (prepubescent), § 2G2.2(b)(3)(F) (distribution), § 2G2.2(b)(4) (sadistic or masochistic), § 2G2.2(b)(6) (cellular telephone), and § 2G2.2(b)(7)(D) (600 or more images).  With zero criminal history points and an adjustment for acceptance of responsibility, his guideline range was 151 to 188 months.  Probation recommended 151 months, as did the government.  Mr. La Plante's attorney asked the court to vary downward, and the court did, in his counsel's words, mostly due to the "archaic" nature of the guideline, § 2G2.2.  The judge sentenced Mr. La Plante to 80 months.  Exhibit F.[10]

### 2.    Benjamin Pitsch, Western District of Louisiana Case Number 2:22-CR000191

Mr. Pitsch was 18 years old at the time of his offense and, like Mr. Noble, had no criminal history.  There were aggravating factors, such as comments he made in the Kik group indicating he was looking for "rape child porn."  He was permitted to plead to possession of child pornography, even though there was evidence supporting distribution.  Exhibit G; Exhibit

---

[8] Attached hereto as Exhibit D is the complaint in Mr. La Plante's case.

[9] Attached hereto as Exhibit E is the indictment in Mr. La Plante's case.

[10] Attached hereto as Exhibit F is the Judgment in Mr. La Plante's case.

H.[11]  He was on pretrial release through sentencing and incurred no violations.  Probation and the government asked for a within-guideline sentence.  His attorney asked for a variance, on multiple grounds, including the defendant's youth, the irrationality of § 2G2.2, and a forensic evaluation showing the defendant posed a low risk of reoffending.  Based on these factors the court varied downward to 87 months.  Exhibit I.[12]

### 3.    Drew Linn Jennings, Middle District of Pennsylvania Case Number 3:22-CR-00204

Mr. Jennings was also a member of the same Kik chat group in which Mr. Noble, Mr. La Plante, and Mr. Pitsch were members.  Exhibit J.[13]  He was charged with three counts of attempted distribution of child pornography.  He was detained pending trial or guilty plea.  He entered a guilty plea to one count of attempted distribution.  The probation officer recommended, and the court adopted, adjustments under § 2G2.2(b)(2) (prepubescent), § 2G2.2(b)(3)(F) (distribution), § 2G2.2(b)(6) (cellular telephone), and § 2G2.2(b)(7)(D) (600 or more images), for an adjusted offense level of 33 and a total offense level after acceptance of responsibility of 30.  With criminal history category IV, his guideline range was 135 to 168 months.  The court sentenced him to 84 months.  Exhibit L.[14]

//

---

[11] Attached hereto as Exhibit G is the Information in Mr. Pitsch's case; he waived indictment and entered a guilty plea to this count.  Attached hereto as Exhibit H is the indictment in Mr. Pitsch's case, showing he was originally charged with both distribution and possession.

[12] Attached hereto as Exhibit I is the Judgment in Mr. Pitsch's case.

[13] Attached hereto as Exhibit J is the Complaint in Mr. Jennings' case, setting forth some of the conduct for which he was arrested.

[14] Attached hereto as Exhibit L is the Judgment in Mr. Jennings' case.

**C.   Unwarranted Disparity Created by Mr. Noble's Ineligibility for Status as a "Zero-Point" Offender under U.S.S.G. § 4C1.1.**

In addition to the myriad other grounds that exist to increase sentences for sex offenders under federal law, Mr. Noble is not eligible for an adjustment for being a zero point offender due to his conviction of a sex offense.  This creates an unwarranted disparity and is thus an additional basis for a variance below the guidelines.

But for his conviction of a sex offense, Mr. Noble would qualify for the two-level decrease under § 4C1.1.  He did not receive any criminal history points from Chapter Four, Part A, and has no prior convictions or arrest history of any kind, *see* ¶¶ 52-59.  § 4C1.1(a)(1).  Nor do any of the other disqualifying factors listed in § 4C1.1(a)(2)-(a)(10) apply in his case.

**D.   Unwarranted Disparity Created by Mr. Noble's Ineligibility for Earned Time Credits under the First Step Act.**

The First Step Act (FSA) allows certain prisoners to participate in incentive programs and earn time credits that will be applied toward pre-release custody or an early transfer to supervised release.  18 U.S.C. § 3632.  The statute includes ineligibility factors, including "if the prisoner is serving a sentence for a conviction under [certain specified] provisions of law."  § 3632(d)(4)(D).  Mr. Noble's offense of conviction is a disqualifying conviction.  § 3632(d)(4)(D)(xlii).  That is, he, unlike other prisoners, cannot earn time credits based on his participation in programs.  This too is an unwarranted disparity.

**IV.   THIS COURT SHOULD VARY DOWNWARD BECAUSE THE CALCULATION OF THE NUMBER OF IMAGES PURSUANT TO U.S.S.G. § 2G2.2(b)(7)(D) HAS NO RATIONAL CONNECTION TO INCREASED CULPABILITY.**

Probation recommends a five-level increase in offense level based on its conclusion that Mr. Noble "distributed" 16 videos, or 1,200 images, containing CSAM pursuant to § 2G2.2(b)(7)(D).  PSR at ¶ 38.  Probation applied Application Note 6 to § 2G2.2, which

16

1  presumes a video is 75 images, in order to conclude Mr. Noble distributed 1,200 (16 x 75)

2  images.  In fact, each video was less than two minutes long and the total length of the videos,

3  added together, is less than 20 minutes.[15]  Mr. Noble contends a downward variance is

4  warranted because § 2G2.2(b)(7) bears no rational relationship to his actual culpability.

5       U.S.S.G. § 2G2.2(b)(7)(D) instructs a court to apply a five-level enhancement if the

6  offense involved "600 or more images[.]"  "Images" means "any visual depiction, as defined in

7  18 U.S.C. § 2256(5), that constitutes child pornography, as defined in 18 U.S.C. § 2256(8)." 18

8  U.S.C. § 2256(8) defines "child pornography" as

9
10
11       … any visual depiction, including any photograph, film, video, picture, or
         computer or computer-generated image or picture, whether made or produced by
12       electronic, mechanical, or other means, of sexually explicit conduct, where—

13       (A) the production of such visual depiction involves the use of *a minor engaging
         in sexually explicit conduct*;
14

15       (B) such visual depiction is a digital image, computer image, or computer-
         generated image that is, or is indistinguishable from, that of *a minor engaging in*
16       *sexually explicit conduct*; or

17       (C) such visual depiction has been created, adapted, or modified to appear that an
         identifiable minor is engaging in sexually explicit conduct.
18

19  § 2256(8) (emphasis added).

20       Application Note 6 to § 2G2.2 regarding the application of § 2G2.2(b)(7) states that an

21  "upward departure may be warranted" if the Court determines that "the number of images

22  substantially underrepresents the number of minors depicted" or that "the length of the visual

23
24
25
26
_____

27  [15] The files that the government has indicated it can prove contain CSAM and their lengths are as
    follows: IMG_1743.mp4 (0:53); IMG_1830.mp4 (0:42), IMG_1831.mp4 (00:19); IMG_1900.mp4
    (1:59); IMG_1912.mp4 (0:42); IMG_1913.mp4 (1.57);  IMG_1940.mp4 (0:51); IMG_1941.mp4 (1:30);
28  IMG_1942.mp4 (1:58), IMG_1945.mp4 (0:58); IMG_1947.mp4 (0:44); IMG_1948.mp4 (1:30);
    IMG_1950.mp4 (1:30); IMG_1951.mp4 (1:58); IMG_1955.mp4 (0:08); IMG_1960.mp4 (0:50).

depiction is substantially more than 5 minutes."  Employing the same logic, here, because each video is substantially less than five minutes long, a downward variance is warranted.

The clear intent of the guideline is to punish more severely those defendants who possess or distribute a video containing a longer period of child sexual abuse.  Obviously, a defendant who distributed 16 videos that each contain one hour of CSAM is more culpable than Mr. Noble, who distributed 16 videos that each contain less than two minutes of CSAM.  But under this guideline, both defendants would receive the same punishment.  Further, a defendant who distributed one 20-minute video would receive only a two-level adjustment under § 2G2.2(b)(7)(A) while a defendant who possessed multiple videos that total 20 minutes, like Mr. Noble, could qualify for a five-level increase.  This is not rational and the fact that the relevant guideline implies a significant increase in sentence without a rational basis is a ground to depart from the guideline.

The harm punished here is abuse of a minor.  Mr. Noble concedes there is a rational relationship between a defendant's culpability and the total length of time a minor is abused. Here, the total length of abuse depicted in the videos Mr. Noble distributed is less than 20 minutes.  It is Mr. Noble's position that this warrants a downward variance.

**V.      THE COURT SHOULD VARY DOWNWARD BECAUSE OF MR. NOBLE'S EFFECTIVE USE OF COUNSELING WHILE UNDER SUPERVISION DEMONSTRATING IMPRISONMENT IS NOT NEEDED TO PROMOTE RESPECT FOR THE LAW, TO AFFORD ADEQUATE DETERRENCE, OR TO PROTECT THE PUBLIC FROM FURTHER CRIMES.**

The Court should vary down to the minimum term because Mr. Noble's over two years of sex offender treatment as well as his own participation in additional counseling have shown that imprisonment is unnecessary to promote deterrence or to protect the public.  His history in treatment has shown that he does not pose the kind of danger that a lengthier prison term is

intended to address, leaving the five-year mandatory term sufficient to suit the only other

legitimate sentencing purpose under § 3553(a) – punishment.[16]

Mr. Noble was on pretrial release from May 23, 2022 until he was remanded on June 13,

2024 based solely on his guilty plea.  PSR at ¶ 8.  While on pretrial release, he participated in

sex offender treatment.  His treatment provider, Jessica Belfy, Ph. D., states that he has

exhibited sensitivity to the plight of child sexual abuse victims and has made significant

progress in addressing the factors that contributed to his offending in treatment and poses a

below-average risk of reoffending.  PSR at ¶ 63; Exhibit A (under seal).  He voluntarily

participated in 35 hours of additional counseling with a church counselor, Michael Bradley, and

with the defense forensic evaluator Dr. Thomas.  ECF No. 73-7 at pp. 20, 23.

Mr. Noble's participation in treatment is a legitimate basis for a variance below the

guideline range.  *See, e.g., United States v. Green*, 152 F.3d 1202, 1206 (9th Cir. 1998); *Pepper

v. United States*, 562 U.S. 476 (2011) (Courts may vary downward to account for post-

sentencing rehabilitation).

## VI.     THE COURT SHOULD VARY DOWNWARD BECAUSE OF MR. NOBLE'S YOUTH AT THE TIME OF THE OFFENSE.

Currently, U.S.S.G. § 5H1.1 provides, in pertinent part, "Age (including youth) may be

relevant in determining whether a departure is warranted, if considerations based on age,

---

[16] Some may argue that a lengthier term promotes "general deterrence," but the Department of Justice itself casts doubt on the argument.  In a May 2016 broadsheet by the National Institute of Justice, "FIVE THINGS ABOUT DETERRENCE," item 4 states: "Increasing the severity of the punishment does little to deter crime."  "Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes."  Item 2 states, "Sending an individual convicted of a crime to prison isn't a very effective way to deter crime," and explains that "[p]risons are good for punishing criminals and keeping them off the street, but prison sentences (particularly long sentences) are unlikely to deter future crime."  The publication may be found at: https://www.ojp.gov/pdffiles1/nij/247350.pdf.

individually or in combination with other offender characteristics, are present to an unusual

degree and distinguish the case from the typical cases covered by the guidelines."

The Commission is currently considering an amendment to § 5H1.1 which would take

into account scientific research showing that youthful offenders – those whose offenses were

committed when the offenders were in their mid-20s or younger – have reduced culpability and

are less likely to reoffend as they mature.[17]  The following language is currently proposed to be

added to § 5H1.1:

> A downward departure … may be warranted due to the defendant's youthfulness
> at the time of the offense. In an appropriate case, the court may consider whether a
> form of punishment other than imprisonment might be sufficient to meet the
> purposes of sentencing. In determining whether a departure based on youth is
> warranted and the extent of such departure, the court should consider the
> following:
>
> > (1)  Scientific studies on brain development showing that psychosocial
> > maturity, which involves impulse control, risk assessment, decision-
> > making, and resistance to peer pressure, is generally not developed until the
> > mid-20s.
> >
> > (2) Research showing a correlation between age and rearrest rates, with
> > younger individuals rearrested at higher rates and sooner after release than
> > older individuals.

Prop. Amds. at p. 38.

The conduct in this case occurred between the dates of March 23, 2022 and April 12,

2022, when Mr. Noble was 26 years old.  PSR at p. 2; ECF No. 13 at pp. 1-3.  Not only was Mr.

Noble a youthful offender – that is, the offenses were committed when he was in his mid-20s

(*see* Prop. Amds. at p. 18 ("Research has shown that brain development continues until the mid-

20s on average, potentially contributing to impulsive actions and reward-seeking behavior,

---

[17] The proposed amendments can be found at
https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-
amendments/20231221_rf-proposed.pdf.  They are referenced herein as "Prop. Amds."

although a more precise age would have to be determined on an individualized basis.

[Citations.]) – but psychological testing shows Mr. Noble is "somewhat immature and

impulsive" and a "risk taker who may do thing others do not approve of." PSR at ¶ 69. These

qualities are likely due to his youth, rather than any settled characteristic.

VII.   **"THE NATURE AND CIRCUMSTANCES OF THE OFFENSE" AND THE "HISTORY AND CHARACTERISTICS OF THE DEFENDANT" AS WELL AS THE OTHER § 3553(a) FACTORS DISCUSSED ABOVE SUPPORT A SENTENCE OF FIVE YEARS.**

Probation failed to identify any factors that would justify a variance under § 3553(a).

PSR at ¶¶ 111-112. While the probation officer, in his justification for a within-guidelines

sentence, noted some positive aspects of Mr. Noble's character and background, he ultimately

concluded a within-guideline sentence was warranted because of the circumstances of the

offense, which the probation officer states are "disturbing[,]" and the characteristics of the

defendant, noting the findings of Dr. Thomas that Mr. Noble tends to represent himself in a

positive light while inwardly feeling confused and unhappy about himself. ECF No. 73-1 at p.

2. There is no mention of the findings of the two evaluators – the court-ordered evaluator and

the defense evaluator – that Mr. Noble poses a low risk of reoffending, in line with most child

pornography offenders, nor does the probation officer give any weight to Mr. Noble's positive

characteristics as attested to by friends and family.

While certainly the images and videos are disturbing, as is any child pornography image

or video, as argued above, images and videos containing prepubescent minors and sadistic or

masochistic conduct are present in the vast majority of child pornography cases. As the

Sentencing Commission has opined, the fact that a child pornography offender has such images

has more to do with the advancement of computer technology than it does the individual

proclivities of the offender. Mr. Noble did not create the videos and there is no evidence he ever

21

committed an actual offense against a child.  In fact, two evaluators – the court ordered

treatment provider, Dr. Belfy, and Dr. Thomas – opine that he poses a "low" or "below-average"

risk of reoffending based on several factors, including his sensitivity to the plight of child abuse

victims, his remorse, his acceptance of responsibility for the conduct, and the insight he has

gained regarding the factors that led to the offense conduct.  Exhibit A (under seal); Exhibit B

(under seal) at p. 19.

The PSR fairly characterizes Mr. Noble's history and characteristics.  PSR at ¶¶ 61-83.

He has no criminal history, not even an arrest history.  There is zero evidence – even after an

investigation – that he ever committed an assault on anyone while working as a coach.  To the

contrary, the persons interviewed in the U.C. Davis investigation generally had positive things

to say about Mr. Noble's character and conduct.  *See* Exhibit C at p. 6.  Likewise, he

submitted numerous letters from friends, family and others attesting to his good character and

conduct, *even after being informed about the charged conduct*.  ECF No. 73-7.  His post-arrest

conduct while on supervision further supports the findings that he is motivated to address the

factors that led to this case, amenable to treatment, and poses a low risk of reoffending.[18]  Also,

---

[18] The fact that there was an investigation into whether a violation occurred does not change the fact that Mr. Noble is amenable to supervision and a term of supervision with conditions is adequate to protect the public.  The government clearly believes it is relevant to the Court's determination of sentence that, in September of 2023, Mr. Noble and his mother's computers were subjected to a forensic analysis after evidence surfaced that Mr. Noble may have been accessing social media sites like Instagram.  ECF No. 73-3 at p. 2 (asking probation to include a summary of the investigation into possible violations of pretrial release).  It should be noted that Mr. Noble was permitted to access social media sites while on pretrial release by his pretrial services officer in the Southern District until December 2022 when the government insisted his conditions be modified to disallow arguably innocuous conduct.  *See* PSR at ¶¶ 4, 7. The forensic analysis of the computers revealed no items concerning for pornography, adult or otherwise.  Rather, the investigation showed that Mr. Noble's mother would sometime respond or access social medial sites to stream videos with Mr. Noble or to allow him to communicate with friends.  Mr. Noble's mother said she did this because she was concerned about Mr. Noble's mental health.  The forensic analysis of the devices revealed no evidence that pornography was accessed on either device.  Neither pretrial services nor the government sought a violation of supervised release, and Mr. Noble continued on pretrial release without further incident.

his cooperation with law enforcement, his full acceptance of responsibility for his conduct, and the strong family support he enjoys also justify a sentence of five years.  PSR at ¶¶ 17-18, 31-34.

The Court should also consider, in fashioning a sentence that is sufficient but not greater than necessary to satisfy the sentencing objectives of § 3553(a), that, in addition to five years, Mr. Noble will likely be on supervised release for 10 years, as that is Probation's recommendation and he is not objecting to this term, ECF No. 73-1 at p. 1, subject to strict conditions and close scrutiny.  *See United States v. Pena*, 930 F.2d 1486, 1494-1495 (10th Cir. 1991) (finding "the length and conditions of supervision," as well as the defendant's family responsibilities and the aberrational nature of the conduct justified a departure to a term of probation).  He will have to register as a sex offender.  He has already been closely supervised for about three years.  He has lost the job he loves and will never be able to coach minors again in all likelihood.  His life is drastically changed by his contact with federal authorities.  A five-year sentence combined with all the other consequences he is and will face as a federal child pornography offender is more than enough punishment for this young man.

**VIII.  CONCLUSION**

For all the reasons set forth above, Mr. Noble respectfully requests the Court impose a sentence of five years and recommend an institution in California that will allow frequent contact with friends and family as well as continued treatment.

Dated: September 19, 2024                    Respectfully submitted,

                                                             /s/ Erin J. Radekin
                                                            ERIN J. RADEKIN
                                                            Counsel for Defendant
                                                            DANIEL JOSEPH NOBLE

**PROOF OF SERVICE**

*United States v. Daniel Noble*; case no. 2:22-cr-00123-DJC.

I am a citizen of the United States and a resident of the County of Sacramento.  I am over the age of eighteen years and not a party to the above-entitled action.  On the date below, I served the following document(s):

**SENTENCING MEMORANDUM**

(X)     BY MAIL.  I caused such envelope, with postage thereon fully prepaid, to be placed in the United States Mail at Sacramento, California addressed as follows:

Daniel W. Noble
Yuba County Jail
215 5th Street
Marysville, CA 95901

(  )     BY PERSONAL SERVICE.  I caused such document(s) to be delivered by hand to the offices of the person(s) listed below:

(  )     BY FACSIMILE SERVICE.  I caused the document(s) to be served via facsimile to the person(s) listed below:

(  )     BY EMAIL SERVICE.  I caused the document(s) to be served via email to the person(s) listed below:

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 19, 2024, at Sacramento, CA 95811.


 /s/ Melissa Amanda Trinidad
MELISSA AMANDA TRINIDAD

24