EXHIBIT C

# Phase I Investigation Report to U.C. Davis regarding Daniel Noble

### JUNE 2022

Ellen London
London & Stout P.C.
1999 Harrison Street, Suite 655
Oakland, CA 94612



**I.    INTRODUCTION**

On May 19, 2022, the FBI arrested Daniel Noble, the assistant coach for the UC Davis men's water polo team at the time, for knowingly distributing visual depictions[1] of minors engaging in sexually explicit conduct.[2] UC Davis placed Noble on administrative leave that same day and terminated Noble's employment on May 20, 2022. Also on May 20, 2022, UC Davis launched an investigation to determine whether Noble may have violated certain University policies and whether there are potential victims in the UC Davis community. UC Davis charged myself and my law firm, London & Stout P.C., with conducting that investigation and issued a charge letter directing me to serve as University investigator. UC Davis asked us to take a phased approach to the investigation and to undertake the following as "phase 1" of the investigation:

- Fully review Noble's activities over his time with UC Davis to assess whether there may be potential victims in the community;

- Determine whether any information suggests that Noble engaged in misconduct of the type prohibited by the University's Sexual Violence and Sexual Harassment Policy ("SVSH Policy") or that would constitute an improper governmental activity ("IGA") as defined in the University's Whistleblower Policy; and

- To the extent there was any misconduct of which any University employee was aware, to investigate whether the conduct was appropriately reported and whether appropriate corrective action was taken.

We were instructed to coordinate our investigation with law enforcement. We were given permission to access all relevant University records and the right to interview any University employee. Finally, we were asked not to contact any students during this phase of the review to ensure that any potentially impacted students had the support of counselors and other support resources first. The University pointed students and others to its support resources, which include resources for reporting sexual misconduct and mental health resources, on its "Daniel Noble Investigation" website.

In conducting our investigation, we not only investigated Noble's coaching activities for UC Davis, but we also reviewed his work for the Davis Water Polo Club ("DWPC"), a private water polo club not affiliated with the University where Noble worked as an assistant coach. Although the DWPC is a separate entity, the DWPC uses the UC Davis Schaal Aquatic Center ("Schaal") for practices (with the exception of a period during the pandemic when the DWPC players practiced at another non-University facility).[3]

---

[1] Such visual depictions are commonly referred to as Child Sexual Abuse Material ("CSAM").

[2] To date, Noble has not been charged with any crime pertaining to production of CSAM or other conduct involving direct sexual contact with minors. The affidavit submitted in support of the criminal complaint describes no instance in which Noble is alleged to have had direct sexual contact with a minor.

[3] For purposes of this investigation, we assume that UC Davis water polo facilities, including the coaches' offices, pool and surrounding areas, and locker room facilities, qualify as "state offices" within the meaning of California Government Code Section 8547.2(c).

## II.     SUMMARY OF FINDINGS

We did not find evidence that Noble engaged in conduct that would violate the SVSH Policy in connection with his University or DWPC coaching activities. We found no evidence of potential victims of the type of conduct described in the pending criminal charges against Noble or other sexual abuse, sexual violence, harassment, or privacy violations in the UC Davis community.

Other than evidence suggesting that Noble knowingly retained and used funds that he received with his paycheck from UC Davis in excess of what he was owed under his coaching contract, we found no evidence that Noble engaged in any activity that would constitute an improper governmental activity ("IGA") under the Whistleblower Policy. By failing to report that UC Davis had inadvertently paid him more than he was owed for a certain period of time, Noble may have engaged in fraud, theft of government property, or economically wasteful conduct that may qualify as an IGA. This single instance of potential misconduct, however, has no relation to the conduct that led to Noble's arrest and, once the overpayment was discovered, UC Davis employees took appropriate corrective action in requiring Noble to return the overpaid amount.

## III.    INVESTIGATIVE PROCESS

### A.     Evidence Preservation

In conducting our investigation, we worked with the University to preserve all potentially relevant evidence, and the witnesses with whom we spoke also agreed to preserve potentially relevant evidence. The University has Noble's laptop in a secure location. Noble used his assigned laptop for University work and there is no evidence that he had or used other University computers for his work. Noble was offered a University phone but declined to take one. Law enforcement has Noble's personal phone.

### B.     Relevant Policy Provisions

The University of California system-wide SVSH Policy (effective January 1, 2022 to present) addresses the "University's responsibilities and procedures related to sexual violence, sexual harassment, retaliation, and other prohibited behavior . . . in order to ensure an equitable and inclusive education and employment environment." The policy defines the relevant prohibited conduct and sets forth the administrative procedures the University uses to resolve reports of such conduct. The policy defines different categories of sexual violence. The sections of the policy potentially relevant to this investigation, based on the allegations in the criminal complaint against Noble, include Sexual Assault – Contact (Section II.B.1.b.), Sexual Exploitation (Section II.B.1.e.), and Invasions of Sexual Privacy (Section II.B.3.a.).

The University of California Whistleblower Policy provides that the University is responsible for investigating and appropriately addressing allegations of suspected IGAs. The Policy borrows its definition of an IGA from California Government Code Section 8547.2(c), which defines an IGA as:

> an activity by a state agency or by an employee that is undertaken in the performance of the employee's duties, undertaken inside a state office, or, if undertaken outside a state office by the employee, directly relates to state

2

government, whether or not that activity is within the scope of his or her employment, and that (1) is in violation of any state or federal law or regulation, including, but not limited to, corruption, malfeasance, bribery, theft of government property, fraudulent claims, fraud, coercion, conversion, malicious prosecution, misuse of government property, or willful omission to perform duty, or (2) is in violation of an Executive order of the Governor, a California Rule of Court, or any policy or procedure mandated by the State Administrative Manual or State Contracting Manual, or (3) is economically wasteful, involves gross misconduct, incompetency, or inefficiency.

### C.  Witnesses

We spoke with the following witnesses on the following dates:[4]

| Name | Affiliation | Date Interviewed |
| --- | --- | --- |
| ███ | UC Davis Athletics | June 1, 2022 and June 23, 2022 |
| ███ | UC Davis Athletics | June 1, 2022 |
| ███ | UC Davis Athletics | June 3, 2022 |
| ███ | UC Davis Athletics | June 6, 2022 |
| ███ | UC Davis Athletics | June 7, 2022 |
| ███ | UC Davis Athletics | June 7, 2022 |
| ███ | UC Davis Athletics | June 7, 2022 |
| ███ | UC Davis Athletics | June 8, 2022 |
| ███ | UC Davis Athletics | June 8, 2022 |
| ███ | UC Davis Athletics | June 8, 2022 |
| ███ | UC Davis Athletics | June 8, 2022 |
| ███ | UC Davis Athletics | June 9, 2022 |
| ███ | UC Davis Athletics | June 13, 2022 |
| ███ | UC Davis Athletics | June 13, 2022 |
| ███ | DWPC | June 15, 2022 |
| ███ | UC Davis Safety Services | June 15, 2022 |
| ███ | DWPC | June 15, 2022 |

We selected these individuals because they had knowledge about Noble's activities at the University or the DWPC or because they were identified as friends of Noble. All witnesses were interviewed by videoconference. I conducted all of the interviews, and I was always accompanied by another member of my firm who served as a note taker. Before each interview, I informed the witness that our firm was retained by UC Davis to provide an independent evaluation regarding the scope of Noble's activities over his time at UC Davis; whether Noble was engaged in any misconduct in connection with his water polo activities; and, if any misconduct was discovered, whether that misconduct was appropriately reported to the University. I explained that our firm

---

[4] UC Davis knows the witnesses' names, but for the purpose of protecting the witnesses' privacy, witness names have been redacted from the public report and only each witness's UC Davis department (or non-University affiliation) is included.

3

would be providing a report following the investigation, which would be posted on the University website. For witnesses not affiliated with the University, I confirmed that they agreed to participate in the interview voluntarily, and for University employees, I confirmed that they understood that they had a duty to cooperate. I reminded witnesses about the University policy prohibiting retaliation for participating in the investigation. All of the witnesses stated that they were comfortable speaking with us without an attorney or other support person present.

Given the broad scope of the conduct implicated by the policy provisions, and our mandate to identify any potential conduct in violation of these policies, we asked the witnesses questions aimed at uncovering misconduct more broadly, not just that related to CSAM. The witnesses were cooperative and forthcoming in response to our questions, and no witness appeared to be hiding potentially relevant information. The witnesses who knew Noble were shocked at the news of his arrest and his alleged possession of CSAM. Several witnesses displayed feelings of sadness and anger in response to the criminal allegations. We deemed all of the witnesses to be credible.

### D. Documentary Evidence

We reviewed the following documents:

1. The charging documents in the criminal case against Noble;

2. The Univeristy's HR and related administrative files concerning Noble;

3. Emails sent to or from Noble's UC Davis email account: we reviewed all of Noble's emails except those that we identified as spam (based on the sender or recipient information);

4. End-of-season surveys completed by members of the men's water polo team for the UC Davis Athletics Department;

5. Documentation regarding summer water polo clinics run by UC Davis water polo coaches and held at UC Davis facilities; and

6. Publicly available information on the internet about Noble we located by conducting internet searches on his name, including his public social media posts.

## IV.   FACTUAL BACKGROUND

Noble began coaching for the DWPC in 2017. The University hired Noble in August of 2019 to serve as the part-time second assistant coach for the men's water polo team. The evidence showed that UC Davis followed its standard protocols in hiring Noble. Noble was required to complete a criminal background check as part of the University hiring process, which he passed on August 6, 2019. A few months after the University hired him, Noble began working as the second assistant coach for the women's water polo team while continuing his work with the men's team. In October of 2020, Noble became the first assistant coach for the men's team after the prior first assistant coach left and vacated the position. Noble initially continued his work as the second assistant coach for the women's team, but in 2021, Noble transitioned to working with the men's team full time and stopped coaching the women's team. Noble was terminated by the University on May 20, 2022 following his arrest.

Noble had extensive responsibilities for the men's team and more limited responsibilities for the women's team. As an assistant coach for the men's team, Noble's responsibilities included, among other things, many of the logistical aspects of the program (including purchasing equipment and arranging travel), supporting practices, assisting with recruiting, video scouting of opponents, and standing in for the head coach when he was absent. In terms of recruiting, Noble's responsibilities included responding to emails from recruits, watching highlight tapes and tournaments, participating in video calls, and organizing the recruits in terms of the team's priorities. With the women's team, Noble's core responsibility for much of his tenure was coaching the goalies. Noble generally was not responsible for recruiting for the women's team.

In addition to coaching the collegiate teams, Noble, along with the head coach of the men's team, conducted three one-day water polo skills clinics in the summer of 2021 for younger athletes. These clinics were open to boys and girls entering eighth-twelfth grade, and were held at Schaal.[5]

Noble continued to coach for the DWPC at various points while he was a collegiate coach. In order to coach for the DWPC, witnesses stated that Noble had to be registered with U.S.A. Water Polo and to have passed background checks conducted by the U.S. Center for SafeSport ("SafeSport"). From 2017 until his termination, Noble worked with different age groups at the DWPC. He worked with the 10 and under age group (which includes both girls and boys), as well as the 12 and under and 14 and under girls' teams and high school boys. Play at the DWPC was suspended for a period of time during the pandemic, and in the third quarter of 2020, the DWPC resumed operations but moved from Schaal to the Arroyo Pool in Davis, which is not a University facility. The DWPC moved practices back to Schaal in July of 2021. Noble also worked with the UC Davis men's water polo team members through the DWPC because in the summer, the UC Davis men's water polo team operates as a club sport.

We did not find evidence that Noble participated in any other professional activities during his time as a UC Davis coach. Witnesses were confident that Noble did not privately coach any players, and we found no evidence to contradict that.

V.     **FINDINGS**

    A.     <u>**We Found No Evidence that Noble Engaged in Misconduct that Violated the SVSH Policy with Respect to his University or other Coaching Activities**</u>

Many of the witnesses directly observed Noble's work as a coach. None of them observed Noble engage in behavior that violated the SVSH Policy. We also spoke with some of Noble's friends, who observed him outside of his professional role, and who also did not observe him engage in behavior that violated the SVSH Policy. Finally, the documents that we reviewed did not contain any evidence of any violation of the SVSH Policy.

---

[5] After Noble's arrest, UC Davis personnel discovered that Noble had not completed the Child Abuse and Neglect Reporting Act Training for Mandated Reporters and Abuse Prevention (Minors) for Volunteers, which Noble and other coaches conducting summer camps or clinics were required to complete. There is no evidence that this was anything other than an oversight, and the evidence shows that Noble was not the only coach who failed to complete the training. Witnesses have stated that UC Davis has since implemented safeguards to ensure that coaches complete the required training before receiving camp funding.

5

With respect to Noble's coaching style and interactions with players, coaches, and other staff, the witnesses familiar with Noble's coaching described Noble as professional. Noble was consistently described as even-tempered with both athletes and coaches. He understood and by all accounts respected the boundaries between coaches and players and none of the witnesses that we interviewed believed that he socialized with or contacted UC Davis water polo athletes for social reasons.

With respect to recruiting, Noble appeared to have adhered to the requirements of his role. Much of the recruiting during Noble's tenure was done by Zoom due to the pandemic, although he also traveled off campus for recruiting trips and assisted with on-campus visits with recruits. When Noble traveled to tournaments for recruiting purposes, the witnesses told us that he would not have interacted directly with the players. Rather, Noble was directed to sit alone, observe the players during the tournament, and take notes. When recruits came to the UC Davis campus, the coaches typically took the recruits around campus and to meals together. Noble occasionally took a recruit around on his own, but the head coach usually accompanied him. None of the coaches ever observed Noble acting inappropriately with a recruit or engaging in any behavior with respect to recruiting that deviated from Noble's assigned responsibilities. No witness knew of any complaints from any recruit or their families concerning Noble.

We found no evidence of any misconduct in violation of the SVSH Policy with regard to the summer clinic. Noble coached the players exclusively from the pool deck, and thus did not coach in close proximity to them. We found no evidence of any player, parent, or anyone else raising any concerns with regard to his conduct at the clinic.

As with the witness interviews, none of the documents we reviewed, which included over ten thousand emails, raised any concern about Noble with respect to the SVSH Policy. Noble's emails generally related to Noble's coaching activites, and included communications concerning workout schedules and regimens, recruiting, tournament travel, and coaching-related administrative tasks (such as team expenses).

We also found no evidence that Noble engaged in any inappropriate behavior while he was working for the DWPC. As with his UC Davis coaching roles, Noble appeared to have been a well-respected and well-liked coach at the DWPC. Given the way that he coached the DWPC players, Noble was generally not in close physical proximity with them. During practices, he was on the pool deck, and parents generally watched practices and tournaments. The Schaal locker rooms have been closed and off limits to non-UC Davis employees and students as of the beginning of the pandemic (remaining open only to UC Davis employees and athletes); in addition, the DWPC teams used the Arroyo Pool for a period of time instead of Schaal, and locker rooms and restrooms were closed there during the relevant time period as well. In terms of tournaments, the coaches had very limited interaction with the players outside of the pool and there were always parents around. As with his University coaching, we found no evidence of any violation of the SVSH Policy by Noble while coaching for the DWPC.

Finally, we have not learned of any complaints or other concerns from community members regarding Noble following Noble's arrest. No athletes, parents, or community members have come forward with information suggesting that Noble violated the SVSH Policy. Indeed, the friends of Noble who we interviewed described him as well-liked and fulfilled by his role as a coach, and none of them identified any behavior by Noble that struck them as troubling.

### B. There Is Some Evidence that Noble May Have Engaged in Conduct that Constitutes an IGA under the Whistleblower Policy

Due to an administrative error at UC Davis, Noble was overpaid in the amount of approximately $10,000 in take-home pay over a period of nine months. One witness told us that Noble became aware that he was being overpaid, but Noble did not tell anyone at the University about the error; the error was ultimately discovered by the University. There is some question as to whether Noble's awareness of and failure to report the overpayment amounts to an IGA under the Whistleblower Policy, in particular whether Noble's conduct constituted fraud, theft of government property, or was economically wasteful. The University required Noble to repay the money (through a repayment plan), which he agreed to, and the money was fully returned. Thus, even if Noble's conduct amounted to an IGA, the University took appropriate action to correct the situation.

Other than this issue relating to the overpayment, we did not identify evidence of any other IGA.

## VI. CONCLUSION

The evidence we considered in this investigation included information obtained from reviewing over ten thousand documents and speaking with 17 witnesses. That evidence demonstrates that Noble kept any alleged activity involving CSAM separate from his professional life at UC Davis. With the potential exception of the overpayment issue identified in this report, we found no evidence of conduct by Noble in connection with his coaching that violates the relevant policies.